# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**PIERRE CONNER,**

    Plaintiff,

    v.                                                                                    Case No. 18-CV-961

**JESSE HARKE,**
**JOEL SANKEY,**
**DONNA LARSON,**
**CRYSTAL MESEROLE,**
**and BRIDGET McDONALD,**

    Defendants.

## DECISION AND ORDER

    Pierre Conner is a Wisconsin state prisoner representing himself in this 42 U.S.C. § 1983 action. I screened Conner's complaint and allowed him to proceed against the defendants on claims that they violated his Eighth Amendment rights by being deliberately indifferent to his serious medical need (an inguinal hernia). The defendants have moved for summary judgment. For the reasons explained below, I will grant the defendants' motion and dismiss the case.

## UNDISPUTED FACTS

    As a preliminary matter, I note that Conner did not file a separate document responding to the defendants' proposed findings of fact. In fact, it appears that he responded to the defendants' statement of the case, which is part of their brief in support of their motion for summary judgment. When the defendants filed their motion, they were required to include all the relevant rules and a statement that explains that Conner's failure to

respond to their proposed findings of fact would result in the facts being taken as true. They did so. (Docket # 38.) I also warned Conner what would happen if he failed to respond to the defendants' proposed findings of fact and explained how he should do so. (Docket # 55.) Because Conner failed to comply with the local rule, I could take the defendants' proposed facts as true for purposes of deciding this motion. However, I believe Conner tried to comply. To the extent any of his responses to the defendants' statement of the case are properly supported by admissible evidence, I will consider them.

At all times relevant to this lawsuit, Conner was an inmate at Waupun Correctional Institution. (Defendants' Proposed Findings of Fact ("DPFOF") at ¶ 1, Docket # 40.) Defendants Jesse Harke and Joel Sankey were both correctional officers (DPFOF ¶ 2), and defendants Donna Larson, Crystal Meserole, and Bridget McDonald were nurses working in the Health Services Unit ("HSU") (DPFOF ¶ 3).

Before he arrived at Waupun, Conner underwent a health intake screening and physical examination at Dodge Correctional Institution on August 23, 2013. (DPFOF ¶¶ 4, 5.) The screening noted a reducible left inguinal hernia, which Conner reported having for approximately two years. (DPFOF ¶ 5.) On September 9, 2013, Conner had a physical examination and was prescribed a hernia belt to minimize discomfort. (DPFOF ¶ 6.) Conner was transferred from Dodge to Waupun on October 31, 2013.[1] (DPFOF ¶ 7.) Defendant nurse Donna Larson's transfer screening noted Conner's left inguinal hernia. (*Id.*)

Per the Inmate Handbook and DAI Policy 500.30.11, an inmate should fill out an HSR to request medical care. (DPFOF ¶ 19.) That request will be triaged within 24 hours.

---

[1] The defendants' proposed finding of fact lists the date as October 31, 2014, but this is an error. Review of Conner's medical records show he was transferred on October 31, 2013. (Ex. 1001 at 100, Docket # 43-1.)

(*Id.*) Inmates can ask to see HSU staff by checking the box on the HSR that indicates their desire to be seen. (DPFOF ¶ 20.) HSU staff triage all inmate health requests on a daily basis. (DPFOF ¶ 21.) If the request is urgent or emergent in nature, arrangements will be made for a same-day appointment (if possible) for evaluation by a health care provider. (*Id.*) If the request is emergent, there is no co-pay. (DPFOF ¶ 22.) Emergency status is determined by the healthcare provider (and is not dependent on the outcome). (*Id.*)

On the evening of January 15, 2014, during second shift, Conner tried to lift his bed off the floor and began experiencing pain from his hernia. (DPFOF ¶ 8.) Conner notified security staff on his unit that he was in pain and told defendant Officer Jesse Harke that he was having complications with his hernia. (DPFOF ¶ 9.) Harke reported Conner's complaint to Sergeant Tervonen (not a defendant). (DPFOF ¶ 10.) Tervonen called Larson at 6:05 p.m., relaying Conner's complaints of abdominal pain due to his hernia. (DPFOF ¶ 11.) Conner wanted to be seen in HSU, so Larson told Tervonen that she would see Conner but that a co-pay would apply to the visit. (DPFOF ¶ 12.)

When Tervonen told Conner that a co-pay would apply to his visit, Conner decided not to be seen by Larson. (DPFOF ¶ 15.) Tervonen called Larson back at 6:10 p.m. and told her Conner did not want to be seen. (DPFOF ¶ 16.) Larson told Tervonen to give Conner a Health Service Request ("HSR"), or a "blue slip," and have him submit it if he changed his mind and wanted to be seen. (DPFOF ¶ 17.) Tervonen then asked defendant Officer Joel Sankey to give Conner a HSR, which he did. (DPFOF ¶ 18.)

At the time Tervonen contacted Larson, Conner's only complaint was the pain from his hernia. (DPFOF ¶ 23.) Upon receiving the call from Tervonen and reviewing Conner's medical file, Larson determined that his complaint did not qualify as a medical emergency.

3

(DPFOF ¶ 25.) Larson explains that pain from a pre-existing condition does not automatically indicate an emergent or urgent situation, and hernias are often uncomfortable or painful, sometimes for years, before they are treated with surgical intervention. (DPFOF ¶¶ 26–27.) Conner's hernia was a long-standing pre-existing condition, and hernias are known to cause occasional flare-ups of abdominal pain. (DPFOF ¶ 28.)

Though Larson determined that Conner's condition was not emergent, she offered to see him in the HSU. (DPFOF ¶ 30.) After he decided not to be seen, he never submitted an HSR. (*Id.*) He also did not ask Harke or Sankey to submit an HSR for him during the remainder of second shift (the shift they were working). (DPFOF ¶ 24.) Tervonen completed a WCI Officer Activity Report at the end of second shift, documenting Conner's complaints of pain, his call to HSU, and that "inmate [was] told to submit blue slip." (DPFOF ¶ 31; Ex. 1000 at 3, Docket # 42-1.)

Later in the evening on January 15, 2014, during third shift, HSU received a call from Sergeant Budler-Ronzoni (not a defendant) stating that Conner had vomited in his cell three times. (DPFOF ¶ 34.) Conner cannot recall exactly what time he vomited, except that it was "a while" after he spoke with Officer Sankey. (DPFOF ¶ 35.) According to Conner, he observed blood in his vomit the second and third times he vomited. (DPFOF ¶ 36.)

Defendant nurse Crystal Meserole, who was working third shift (9:30 p.m. to 5:30 a.m.) called Conner at 10:40 p.m. to check on him, but she was unable to reach him by telephone. (DPFOF ¶ 37.) Meserole then went directly to Conner's cell to check his status. (DPFOF ¶ 38.) When she arrived, Conner was alert and oriented but unable to stand to get to the door. (DPFOF ¶ 39.) He had a visible left inguinal hernia and reported nausea, dizziness, and severe pain. (*Id.*) Meserole observed what appeared to be vomit with blood in

4

it in Conner's cell and immediately notified Captain Westra (not a defendant) to send Conner to the emergency room. (DPFOF ¶ 40.) Conner was transported at 11:15 p.m. to be evaluated in the emergency department at Waupun Memorial Hospital. (DPFOF ¶ 42.)

Dr. Ahmend Dessouki saw Conner and diagnosed him with a left inguinal hernia (DPFOF ¶ 43.) Dr. Dessouki ordered an x-ray of his chest and abdomen, as well as blood and urine tests. (*Id.*) The x-ray and lab tests did not reveal any acute cause for his symptoms. (DPFOF ¶ 44.) While in the emergency room, Conner did not experience further nausea or vomiting but did report a dull, moderate pain. (DPFOF ¶ 45.) He was treated and released, and Dr. Dessouki recommended he be prescribed "Norco 5mg-325 mg Q6 PRN," or every six hours as needed, for the pain. (*Id.*) He was also discharged with a recommendation that he have a follow-up appointment with Dr. Robert Mikkeslon for surgical evaluation. (DPFOF ¶ 46.) Conner returned to Waupun that evening without further incident and was seen the following morning at HSU, where he was given docusate for constipation and the recommended Norco 5mg-325 mg for three days for the pain. (DPFOF ¶¶ 47–48.) His emergency department paperwork was forwarded to the doctor. (DPFOF ¶ 48.) Larson also called Conner's housing unit to check on his status the morning of January 17, and he was doing fine. (DPFOF ¶ 49.)

Conner submitted an Interview/Information Request to HSU on January 17, 2014 asking for the names of the nurses who were working the night of January 15. (DPFOF ¶ 50.) Defendant nurse Bridget McDonald (formerly known as Bayer) referred the request to HSU Manager Belinda Schrubbe (not a defendant), who then responded to Conner listing Larson and Meserole as working that night. (*Id.*) Conner submitted another Interview/Information Request dated January 18, 2014 to HSU, asking if his hernia repair

surgery was scheduled yet. (DPFOF ¶ 51.) McDonald responded that day and explained that the date had not been set because the emergency department doctor recommended he have a consult with a surgeon first. (DPFOF ¶ 52.) HSU received another Interview/Information Request dated January 19, 2014 on January 20. (DPFOF ¶ 53.) Conner was requesting a hernia belt, and Larson responded that an appointment would be made to measure him for it. (*Id.*)

HSU received an Interview/Information request from Conner on January 23 inquiring about his hernia belt and asking when he would have an appointment with a surgeon. (DPFOF ¶ 54.) McDonald responded the same day. (*Id.*) McDonald was not authorized to order treatment or to prescribe medications outside the scope of a registered nurse; thus, Conner's hernia belt had to be ordered by an Advanced Care Provider. (DPFOF ¶¶ 55–56.) Conner saw Dr. Manlove (not a defendant) the next day, January 24, to discuss his hernia belt and surgical consultation. (DPFOF ¶ 57.) Dr. Manlove ordered the hernia belt and referred Conner for a consultation. (*Id.*) Conner ultimately underwent successful hernia repair surgery on April 28, 2014. (DPFOF ¶ 60.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary

judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Conner claims that each of the defendants were deliberately indifferent to his inguinal hernia. The defendants move for summary judgment.

Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates "deliberate indifference to serious medical needs of prisoners." *Rasho v. Elyea*, 856 F.3d 469, 475 (7th Cir. 2017) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "To determine if the Eighth Amendment has been violated in the prison medical context, we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then

determining whether the individual was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016.) Deliberate indifference requires that a defendant actually know about, yet disregard, a substantial risk of harm to an inmate's health or safety. *Id*. at 728. "The standard is a subjective one: The defendant must know facts from which he could infer that a substantial risk of serious harm exists and he must actually draw the inference." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016).

The Court of Appeals for the Seventh Circuit has "consistently held that neither a difference of opinion among medical professionals nor even admitted medical malpractice is enough to establish deliberate indifference." *Id.* at 805. "By definition a treatment decision [that is] based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Id.* "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) (internal quotation marks omitted).

The parties do not dispute that Conner had a serious medical condition. Thus, the only question is whether any of the defendants acted with deliberate indifference to Conner's medical condition. I will address each defendant in turn.

　　1.　　Larson

Conner claims that Larson displayed deliberate indifference to his inguinal hernia when she did not see him on an emergency basis. Larson argues that she was not

deliberately indifferent when she determined that Conner's flare-up of a pre-existing condition was not a medical emergency.

According to Conner, he told Harke, "I was in pain" and was "having complications with this pre-existing hernia that I have." (DPFOF ¶ 9.) This is what was conveyed to Larson: that Conner's pre-existing hernia was causing him pain. Conner did not relay any other symptoms—only pain. Larson took that information and reviewed Conner's medical records and determined that his pain did not constitute a medical emergency. This is a classic example of a medical professional exercising her judgment. *See Lewis v. McClean*, 941 F.3d 886, 894 (7th Cir. 2019) ("[The nurse defendant] did not think emergency care was necessary [based on the plaintiff's status]; in other words, she exercised her professional judgment.").

As noted above, a treatment decision based on professional judgment cannot evince deliberate indifference "because it implies a choice of what the defendant believed to be the best course of treatment." *Zaya*, 836 F.3d at 805. You cannot be deliberately indifferent—that is, completely disregard a risk to an inmate's health—if you are evaluating information and making a decision.

I do note that if a jury could infer from the record that Larson did not "*honestly* believe" her decision was sound, then she cannot escape liability. *Id.* But there is nothing in the record to suggest that she thought Conner needed emergency attention and decided not to give it to him. Indeed, the Seventh Circuit has held that pain from a hernia, in and of itself, is not a medical emergency. *Johnson v. Doughty*, 433 F.3d 1001, 1014 (7th Cir. 2006). And that is all Larson knew Conner was experiencing.

I also note that the record establishes that Larson was no longer working when Conner's symptoms worsened—i.e., when he began to vomit. That is, there is no evidence Larson knew of any worsening symptoms. This is not a situation where Larson disregarded his worsening symptoms. *See, e.g.*, *Sherrod v. Lingle*, 223 F.3d 605 (7th Cir. 2000). By the time Conner presented symptoms warranting emergency care, Larson's shift was over.

Because no reasonable jury could find Larson acted with deliberate indifference when not considering Conner's hernia pain a medical emergency, she is entitled to summary judgment.

### 2. *Harke and Sankey*

Both Harke and Sankey are correctional officers, not medical professionals. They argue that they are entitled to summary judgment because they did not ignore Conner's complaints and referred him to the HSU. I agree.

The Seventh Circuit has repeatedly held that nonmedical personnel are "entitled to defer to the judgment of [prison] health professionals as long as they do not entirely ignore a prisoner's complaint. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (citing *Hayes v. Snyder*, 546 F.3d 516, 527–528 (7th Cir. 2008); *Johnson*, 433 F.3d at 1010–11 (7th Cir. 2006); *Greeno v. Daley*, 414 F.3d 645, 655–56 (7th Cir. 2005); *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). If a nonmedical prison official reviews and investigates an inmate's medical complaints and then refers the complaints to the prison's medical provider, that official is not deliberately indifferent. *Greeno*, 414 F.3d at 655–56 ("We do not think [the official's] failure to take further action once he had referred the matter to the medical providers can be viewed as deliberate indifference.").

Here, Conner told Harke that he was experiencing pain from his pre-existing hernia. Harke then told Tervonen, who contacted HSU. Harke then conveyed to Conner that Larson said he would need to pay a co-pay to be seen. That is the extent of his interaction with Conner. Harke did what was required of him—he took Conner's complaints and made sure a medical professional evaluated those complaints. Conner was not displaying any other symptoms (like the vomiting that occurred later) that would have signaled to Harke that he needed to go beyond ensuring a medical professional was notified. On this record, no reasonable fact finder could conclude that Harke was deliberately indifferent to Conner's medical need.

As for Sankey, his only involvement was giving Conner a health service request form at Tervonen's direction. It is undisputed that Conner did not exhibit any other symptoms (beyond pain) until after he received the health service request form. Like Harke, the only thing he could have known was that Conner was in pain. There is no evidence Conner asked for anything, and the record shows he never asked Sankey (or Harke for that matter) to file a health services request. I see no basis to find Sankey was required to take any action. He received a directive from his sergeant to provide Conner with a health services request form. He did that. He is entitled to summary judgment.

  3. *Meserole*

Conner was also allowed to proceed against Meserole. At screening, it seemed that she was the nurse staff member initially contacted and was the one who told Conner to fill out a health services request form. However, Meserole was not working the second shift on January 15, 2014. Thus, she could not have been, and was not, the nurse who told him to file a health services request. Her only contact with Conner was when she saw him after he

vomited and sent him to the emergency room. Sergeant Budler-Ronzoni contacted the HSU after observing that Conner vomited in his cell. When Meserole could not reach him by phone, she went to his cell and, upon seeing what appeared to be blood in the vomit on the cell floor, immediately notified Captain Westra to send Conner to the emergency room.

At his deposition, Conner testified that Meserole sent him promptly because she did not have choice after seeing the state he was in. He seems to think this undermines her decision-making—that somehow, because it took visually assessing his condition for her to decide the next steps—she was deliberately indifferent. But that is not the case. Meserole provided prompt medical care in response to Conner's condition as soon as she was aware of it. This cannot support a claim of deliberate indifference. *See Lewis v. McClean*, 864 F.3d 556, 563 (7th Cir. 2017) (affirming summary judgment in favor of medical professional who arrived at inmate's cell, assessed the inmate, and then directed that the inmate be taken to the emergency room). Meserole is entitled to summary judgment.

    4.    *McDonald*

Finally, Conner was allowed to proceed against McDonald (formerly Bayer), also a nurse, on a claim for deliberate indifference based on her alleged failure to respond to his inquiries about and requests for a hernia belt. However, the record shows that McDonald responded promptly to Conner. He sent a series of Interview/Information Requests to HSU starting January 17, 2014. The first one to which McDonald responded was dated January 18, 2014 and asked about his hernia surgery. McDonald explained it had not been scheduled because it was recommended that he see a specialist for consultation first. Conner sent another Request on January 19, 2014, this time about a hernia belt. Larson responded that an appointment would be made; McDonald did not respond. However, McDonald did

12

respond to an Information/Interview Request about Conner's hernia belt on January 23, 2014, the same day she received it. Conner was seen by Dr. Manlove the next day to discuss his hernia belt and surgical consultation.

The record establishes McDonald herself could not order a hernia belt because one must be ordered by an advanced care provider, which McDonald is not. So she cannot be liable for not ordering a belt. But she also is not liable for failing to respond to Conner's Information/Interview requests about his hernia belt. The first one to which she responded was received January 23, 2014 (though dated the day before). Conner was seen the next day by Dr. Manlove to discuss a surgical consultation and his hernia belt. This was her only contact with him about the hernia belt, and he was seen promptly afterward. On this record, there is no basis upon which a reasonable jury could find McDonald was deliberately indifferent by ignoring Conner's request for a hernia belt. She is entitled to summary judgment.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (Docket # 38) is **GRANTED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED with prejudice**. The Clerk of Court is directed to enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. *See* Fed. R. of App. P. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause

or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. *See* Fed. R. Civ P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 2nd day of March, 2020.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge